**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____


**SAFECO INSURANCE COMPANY OF AMERICA,**
**as Subrogee of Michael & Erin Sciarrino,**

                          **Plaintiff,**

**v.**                                                      **5:15-CV-0316 (BKS/ATB)**

**INSTALLED BUILDING PRODUCTS, LLC d/b/a**
**MIG Building Systems,**

                          **Defendant.**
_____


**Appearances:**

**For Plaintiff:**

Daniel W. Coffey
Bowitch, Coffey Law Firm
17 Elk Street
Albany, NY 12207

Daniel J. Luccaro
Cozen O'Connor
One Liberty Place
1650 Market Street
Philadelphia, PA 19103

**For Defendant:**

Jeffrey J. White
Sorell E. Negro
Robinson & Cole LLP
280 Trumbull Street
Hartford, CT 06103

**Hon. Brenda K. Sannes, United States District Judge:**

## MEMORANDUM-DECISION AND ORDER

# I.    INTRODUCTION

Plaintiff Safeco Insurance Company of America ("Safeco") brings this diversity action as subrogee[1] of Michael and Erin Sciarrino, against Defendant Installed Building Products d/b/a MIG Building Systems, alleging claims arising out of a fire at the Sciarrinos' home on January 1, 2014. (Dkt. No. 45). Plaintiff asserts two causes of action under New York state law, for negligence and strict product liability, on the basis that Defendant supplied and installed a fireplace which caused the fire.[2] (*Id.*). Defendant now moves under Rule 56 for summary judgment on both claims, and also under Rule 12(b)(6) for dismissal of Plaintiff's strict product liability claim. (Dkt. No. 58). Plaintiff opposes Defendant's motion, cross-moves for partial summary judgment and to preclude the testimony of Defendant's expert, and seeks leave to amend. (Dkt. No. 66). For the reasons that follow, Defendant's motion is denied and Plaintiff's motion is granted in part and denied in part.

---

[1] Under the principle of subrogation, upon payment of loss, the insurer-subrogee steps into the shoes of the insured-subrogor and is entitled to all the rights and remedies belonging to the insured-subrogor against a third party that caused the loss. *See In re Sept. 11 Litig.*, 649 F. Supp. 2d 171, 177 (S.D.N.Y. 2009); *Fed. Ins. Co. v. Arthur Andersen & Co.*, 75 N.Y.2d 366, 372, 552 N.E.2d 870, 872 (1990).

[2] The parties assume that New York law governs this action, and the Court will do likewise. "A federal trial court sitting in diversity jurisdiction must apply the law of the forum state to determine the choice-of-law." *Fieger v. Pitney Bowes Credit Corp.*, 251 F.3d 386, 393 (2d Cir. 2001) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 497 (1941)). In product liability actions, New York courts apply the law of the state in which the injury occurred. *See Devore v. Pfizer, Inc.*, 58 A.D.3d 138, 141–42 (N.Y. 1st Dep't 2008); *see also DiBartolo v. Abbott Labs.*, 914 F. Supp. 2d 601, 610 (N.D.N.Y. 2012). Moreover, "New York courts apply an 'interest analysis' to tort cases, under which the law of the jurisdiction having the greatest interest in the litigation controls." *Worldwide Sport Nutritional Supplements, Inc. v. Five Star Brands, LLC*, 80 F. Supp. 2d 25, 29 (N.D.N.Y. 1999). "Pursuant to this interest analysis, 'when the domiciles of the parties differ, the location of the injury determines the governing substantive law absent special circumstances.'" *Id.* (quoting *Gray v. Busch Entertainment Corp.*, 886 F.2d 14, 15 (2d Cir. 1989)). Here, the injury occurred in Baldwinsville, New York.

## II.    BACKGROUND[3]

### A.    The Fire

On January 1, 2014, a fire occurred at the home of Safeco's insureds, the Sciarrinos, located at 67 Cross-Country Drive in Baldwinsville, New York.  (Dkt. No. 58-10, ¶ 1).  Defendant had installed a fireplace at the home on July 27, 2009, during its original new construction.  (*Id.*, ¶¶ 7, 14).  Defendant completed the installation on August 19, 2009.  (*Id.*, ¶ 14).  The Sciarrinos were the original owners of the home, which was part of a new development called Sorrell Hill.  (*Id.*, ¶¶ 7-8).  They did a walk-through of the home in September 2009, purchased the home, and moved in later that month.  (*Id.*, ¶ 7).

### B.    Fireplace Installation

Defendant was retained by Ryan Homes, Inc. as a subcontractor to perform fireplace installations and install insulation in all of the homes that were going to be part of the Sorrell Hill development.  (*Id.*, ¶¶ 8, 21).  Defendant sold a "fireplace installation package" to Ryan Homes which included the fireplace and its installation.  (Dkt. No. 66-2, ¶ 2).  The fireplace was a wood-burning model manufactured by the DESA company.  (*See* Dkt. No. 58-10, ¶ 24; Dkt. No. 66-1, p. 20).  The overall cost of the installation package was $2,100, which included both the cost of the fireplace and the installation.  (Dkt. No. 66-2, ¶ 3; Dkt. No. 79, ¶ 3).  The labor costs for the installation package were less than 15% of the total cost.  (Dkt. No. 66-2, ¶ 4, Dkt. No. 79, ¶ 4).

---

[3] The facts stated herein are drawn from the parties' submissions, including Defendant's Statement of Material Facts, Dkt. No. 58-10; Plaintiff's Response to Defendant's Statement of Material Facts and Counterstatement of Material Facts, Dkt. No. 66-2; and the exhibits the parties have submitted, to the extent that they are admissible as evidence.  Where facts stated in a party's Statement of Material Facts are supported by testimonial or documentary evidence, and denied with only a conclusory statement by the other party, the Court has found such facts to be true. *See* N.D.N.Y. L.R. 7.1(a)(3); Fed. R. Civ. P. 56(e).

The parties have not submitted as evidence any contract specifically covering the sale and installation of the fireplace.[4]  Schedule Sheets dated July 27, 2009 and August 12, 2009 show the materials involved in the installation and related labor costs, which Defendant billed to Ryan Homes; the sheets do not reference the Sciarrinos.  (Dkt. No. 58-4, pp. 2-6; Dkt. No. 66-4).[5]

Defendant's employees James Sailor and Brian Rogers installed the fireplace.  (Dkt. No. 66-2, ¶ 5).  Sailor has been employed by Defendant since 1991 and installing fireplaces for Defendant since approximately 2000.  (*Id.*, ¶ 6).  In 2009, Sailor installed fireplaces five days a week and he estimates that he installed three to five fireplace units a day on average.  (*Id.*, ¶ 7).  At that time, every fireplace that Defendant installed was also sold by Defendant.  (*Id.*, ¶ 8).  Defendant sold fireplaces both to builders and directly to homeowners.  (*Id.*, ¶ 9).

A large percentage of Defendant's fireplace installation business in 2009 came through builders, as a subcontractor to general contractors such as Ryan Homes and others in the Rochester/Syracuse area.  (Dkt. No. 58-10, ¶ 15).  As of 2009, Defendant was providing its services to approximately 75% of all of the builders in the Rochester/Syracuse area.  (*Id.*, ¶ 16).

---

[4] Defendant has submitted an "NVR Master Contractor Agreement," in which Defendant contracted with Ryan Homes "to provide materials and/or to perform services" in connection with "homebuilding operations."  (Dkt. No. 58-3, pp. 1-5).  The contract, which covers a term of five years, is signed and dated January 10, 2003.  (*Id.*, p. 5). Plaintiff asserts that this document "is not relevant as defendant acknowledges that the contract expired in 2008," and moreover, "regardless of its relevance, the Court should not consider this document for any purposes because defendant never produced this document in discovery."  (Dkt. No. 66, p. 20).  Defendant's Regional Vice President of Installed Building Products, Marc Williamson, states in his affidavit that the 2003 agreement "established the framework for the relationship between the parties and the understanding of the scope of work to be performed by MIG, which understanding continued after 2008 and was in place in 2009."  (Dkt. No. 58-2, ¶ 11).  It is not clear whether Defendant entered into a specific contract with Ryan Homes for the Sorrell Hill development, or whether there was a broader one for all homebuilding operations at the time.  As set forth below, there is a factual dispute regarding whether the agreement involving the fireplace at issue in this case was predominately for service or sale. Since by its terms, the 2003 agreement was no longer in force at the time Defendant supplied and installed the fireplace in 2009, the Court has not considered that agreement for the purposes of this decision.

[5] The confidential business information concerning Defendant's labor rates has been filed under seal.  (*See* Dkt. Nos. 59, 63, 66-4).

Defendant has locations in Syracuse, Rochester, and Buffalo, and the Syracuse and Rochester locations have showrooms where they display fireplaces.  (Dkt. No. 66-2, ¶ 10).  Defendant has fireplaces stored in its warehouse at all three locations.  (*Id.*, ¶ 11).  The fireplace installed at the Sciarrino home came from Defendant's inventory.  (*Id.*, ¶ 12).

For over a decade, the overwhelming majority of Defendant's projects were as subcontractors to builders, providing installation services related to fireplaces and insulation as part of large construction and development projects, including new home development projects.  (Dkt. No. 58-10, ¶¶ 17-18).  Defendant would be hired by builders primarily for the installation services it provides and its ability to perform these services on large construction projects; installation jobs require skilled installers in order to ensure proper wall preparation and insulation as well as proper installation of the fireplace and materials.  (*Id.*).  Defendant offers builders, such as Ryan Homes, installation packages, which vary depending on the degree of difficulty of the installation services and labor needed.  (*Id.*, ¶ 19).

For all the fireplaces installed by Defendant for Ryan Homes at the Sorrell Hill development, including the fireplace at the Sciarrino home, Ryan Homes was charged based on an installation package price inclusive of the installation services as well as the fireplace unit, as determined by Defendant in accordance with its agreement with Ryan Homes.[6]  (*Id.*, ¶ 23).  Installing a wood-burning fireplace such as the one at the Sciarrino home is a full day's job that requires at least two professional, trained installers.  (*Id.*, ¶¶ 24-25).  After unpacking the equipment, the installers insulate and drywall the box where the fireplace will be located and seal it to be airtight, which includes installing drywall on the side walls, the rear wall, and the top.

---

[6] As discussed above, the actual agreement has not been submitted as evidence.

(*Id.*, ¶ 26).  The crew then fire caulks the seams and penetrations including any wire penetrations; they then install venting piping, which includes cutting a hole in the top of the firebox for use as a vent.  (*Id.*, ¶¶ 27-28).  The next step is connecting and screwing the pipes; after doing so, the crew installs ember strips and marks the center of the opening so that the fireplace can be centered properly when inserted into the box and mounted.  (*Id.*, ¶¶ 29-30).  The crew then sets the fireplace itself, connects the wires if needed, and sets and seals the vent pipe. (*Id.*, ¶ 31).

## C.    Cause of the Fire

According to Plaintiff's "fire origin and cause expert," Jason Karasinski, "[t]he only potential cause of this fire, is that hot embers from within the wood burning insert dropped from inside the burn box and came into contact with the sub floor below the unit." (Dkt. No. 66-1, p. 70).  Karasinski further opined that this "caused ignition of the flooring eventually burning through the subfloor into the floor joist system," and the fire "eventually burned through the base of the chimney chase as well melting siding directly beneath the stove and point of origin." (*Id.*). Karasinski concluded that "[t]his was made possible because the control access panel was not properly installed or inspected by the installer prior to its use by the homeowner.  The combination of the heat source and first fuel coming together describes the ignition sequence and causation, as well as, responsibility of this fire required by NFPA 921 2014 edition." (*Id.*).[7]

According to Plaintiff's "fireplace expert," Leo Hermann, "[t]he defective installation of this fireplace and its accessory model BK/BKT blower was the cause of this fire." (Dkt. No. 66-1, p. 92).  Hermann opined that there were a total of four installation defects in the area of this

---

[7] NFPA 921 refers to the National Fire Protection Association Guide for Fire and Explosion Investigations.  (*See* Dkt. No. 66-1, pp. 189-92).

fire's origin: 1) improper installation of the ember protector, 2) improper sealant between the hearth extension and the fireplace front, 3) improper thermal conductivity material underneath the hearth extension, and 4) improper installation of the BKT model blower kit.  (*Id.*, p. 88).  Hermann also "found the subject fireplace had th[e] Control Access Cover improperly installed." (*Id.*, p. 91).

Defendant has also submitted expert reports regarding the fire.  Frank Schwalje, an engineering consultant, opined that the fireplace had a design defect.  Specifically, Schwalje opined that "[t]he control access cover panel, which was found to be out of position and partially open and which was alleged to have caused the fire in question by plaintiffs' origin and cause investigator, was not secured in the closed position by the manufacturer despite the manufacturer's knowledge that it can move out of position during transport."  (Dkt. No. 66-1, p. 118).  Schwalje further stated that in his opinion:

> The manufacturer of a product has an obligation to design its product to render it reasonably safe for its intended use.  This panel could have easily been secured by the manufacturer during construction by use of simple fasteners or clips that would have added minimal cost to the product.  Failure to secure the panel in place represents a deviation from widely recognized design principles.

(*Id.*).  Schwalje concluded that "[t]he control access cover that was out of position and partially open prior to the fire . . . was due to the manufacturer's failure to secure the cover in place by using readily available and commonly applied fastening methods."  (*Id.*, p. 119).  Failure to secure the Control Access Cover in place is a deviation from widely recognized design principles.  (Dkt. No. 66-2, ¶ 15; Dkt. No. 79, ¶ 15).  Schwalje also concluded that "the alleged fireplace installation deficiencies enumerated in the Herrmann report were not a proximate cause of the fire as defined by plaintiffs' origin and cause investigator (Mr. Karasinski)," and that

"[t]here is no evidence to indicate that MIG Building Systems caused the control access panel to be opened as part of the fireplace installation they performed."  (Dkt. No. 66-1, p. 119).

Aaron Butcher, a project engineer, opined in another report that "the cause of the fire is undetermined."  (Dkt. No. 66-1, p. 111).  Butcher stated that the burn patterns "were consistent with the fire originating underneath the fireplace."  (*Id.*, p. 110).  Butcher ruled out the blower motor "as being causal to the fire."  (*Id.*).  During his deposition, Butcher identified four potential causes of the fire which he could not rule out: 1) an ember from the fireplace falling through the gap between the front refractory brick and the side of the fireplace; 2) the involvement of some type of ignitable liquid; 3) the fireplace being overdriven from use of excessive amounts of fuel load; and 4) a design defect in the fireplace which would have permitted conductive heat from the fireplace to ignite the subflooring.  (Dkt. No. 66-2, ¶ 25; *see also* Dkt. No. 66-1, pp. 183-86).  As of the date of his deposition, Butcher was still in the process of investigating potential causes.  (Dkt. No. 66-2, ¶ 27).

The Onondaga County Emergency Management Fire Investigation Unit also issued a report on the fire, which concluded that: "this fire was the result of direct heat impingement to the available combustible materials located in/adjacent to the blower unit mounted below and on the right side of the fireplace, with the probability of a mechanical or electrical failure within the blower unit causing the energized wiring to overheat and fail, and subsequently causing the fire." (Dkt. No. 78-6, pp. 9-10).

### III.    STANDARD OF REVIEW

#### A.    Motion to Dismiss for Failure to State a Claim

As an initial matter, Defendant argues that "Plaintiff's strict product liability cause of action in the Second Amended Complaint fails to sufficiently state a claim under Fed R. Civ. P. 12(b)(6) and should be dismissed." (Dkt. No. 58-1, p. 14). In response, Plaintiff argues that by answering the Second Amended Complaint, Defendant has waived its right to move to dismiss under Rule 12(b)(6). (Dkt. No. 66, p. 24). However, Rule 12(h) exempts from waiver the defense of failure to state a claim upon which relief can be granted, which can be raised at any time up to and including trial. Fed. R. Civ. P. 12(h)(2); *see also* § 1361 Timing of Rule 12(b) Motions, 5C Fed. Prac. & Proc. Civ. § 1361 (3d ed.) (recognizing that a motion raising the defense of failure to state a claim upon which relief can be granted "may be considered by the court even when interposed after the responsive pleading has been filed," although it is technically no longer a Rule 12(b) motion).

Further, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnie Gen. Transatlantique*, 405 F.2d 270, 273 (2d Cir. 1968). "A motion for summary judgment may be made solely on the pleadings, when it is so made it is functionally the same as a motion to dismiss or a motion for judgment on the pleadings." *Id.* (citation omitted); *see also Baum v. N. Dutchess Hosp.*, 764 F. Supp. 2d 410, 416 (N.D.N.Y. 2011) ("To the extent that a defendant's motion for summary judgment under Fed. R. Civ. P. 56 is based entirely on a plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6)."). Thus, in evaluating Defendant's motion for summary judgment, the Court will also

consider whether Plaintiff's allegations are sufficient to state a claim for strict product liability. To do so, "a complaint must provide 'enough facts to state a claim to relief that is plausible on its face.'"  *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  In other words, the plaintiff must provide factual allegations sufficient "to raise a right to relief above the speculative level." *Id.* (quoting *Twombly*, 550 U.S. at 555).  The Court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor.  *See E.E.O.C. v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 253 (2d Cir. 2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)).

### B.    Summary Judgment

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact."  *Celotex*, 477 U.S. at 323.  A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 427 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*).  The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322; *see also*

10

*Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (summary judgment appropriate where the non-moving party fails to "come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on an essential element of a claim") (internal quotation marks omitted).

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323–24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. United States Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (citing *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)). Furthermore, "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) (internal quotation marks and citations omitted)).

## IV.    DISCUSSION

### A.    Negligence

Defendant first moves for summary judgment on Plaintiff's negligence claim, on the basis that it is "barred by New York's three-year statute of limitations." (Dkt. No. 58-1, p. 8). Defendant contends that in cases "where the alleged negligent act is the installation of a product as part of a construction project, the limitations period begins to run when the installation is completed." (*Id.*). By Defendant's calculation, Plaintiff's cause of action accrued when the fireplace was installed in 2009, thus making the filing of the Complaint in 2015 untimely. In response, Plaintiff argues that "on a construction defect claim if the plaintiff is in contractual privity with the defendant, the applicable statute of limitations is six years from the date of the work, and if a plaintiff is not in contractual privity with the defendant, the applicable statute of limitations is three years from the date of the injury." (Dkt. No. 66, p. 10). Thus, Plaintiff contends that its claim is timely under either the six year statute of limitations starting in 2009, or the three year period starting on January 1, 2014, when the fire occurred. (*Id.*, pp. 15-16).

In general, under New York law, an action to recover damages for an injury to property must be commenced within three years. N.Y. C.P.L.R. § 214(4). Ordinarily, such a claim for negligence accrues upon the date of the injury. *Kampuries v. Am. Honda Motor Co., Inc.*, 204 F. Supp. 3d 484, 490 (E.D.N.Y. 2016) (citing *Brooklyn Union Gas Co. v. Hunter Turbo Corp.*, 660 N.Y.S.2d 877, 878 (N.Y. App. Div. 2d Dept. 1997)). "That, rather than the wrongful act of defendant or discovery of the injury by plaintiff, is the relevant date for marking accrual."

*Id.* (quotation omitted). "The rationale is that the injury puts the putative plaintiff on inquiry notice and, therefore, charges him or her with responsibility for investigating, within the limitations period, all potential claims and all potential defendants." *Id.* (quotation omitted).

In support of its position that the date of completion of the fireplace starts the clock on Plaintiff's negligence claim, rather than the date of injury, Defendant cites a number of cases which trace their lineage back to *City Sch. Dist. of City of Newburgh v. Hugh Stubbins & Associates, Inc.*, 650 N.E.2d 399 (N.Y. 1995) ("*Newburgh*"). In that case, a school district brought a negligence action against a builder for the defective construction of a library, after a water pipe in the library burst and caused property damage. *Newburgh*, 650 N.E.2d at 400. The school district worked with a development corporation in the design, financing and construction of the library, and it was the development corporation that entered into contracts with the builder to construct the library. *Id.* After construction was completed in 1975, the development corporation then sold the building to the school district, and the pipe did not burst until fifteen years later in 1990. *Id.* The New York Court of Appeals concluded that the school district's negligence claim was time barred, holding that "[i]n cases against architects or contractors, the accrual date for Statute of Limitations purposes is completion of performance." *Id.* at 400–01. The court reasoned that since Plaintiff's claim arose out of a contractual relationship, it accrued on the date construction was completed, rather than the date of injury, as it would for an ordinary negligence claim, stating that "[n]o matter how a claim is characterized in the complaint—negligence, malpractice, breach of contract—an owner's claim arising out of defective construction accrues on date of completion, *since all liability has its genesis in the contractual relationship of the parties*." *Id.* at 401 (emphasis added). The Court emphasized that the school

13

district's relationship with the builder was the "functional equivalent" of privity of contract, since the school district worked closely with the development corporation, and by extension the builder, in the design, financing, and construction of the library. *Id.*

The Court of Appeals recently expounded on this rule in *Town of Oyster Bay v. Lizza Industries, Inc.*, 4 N.E.3d 944 (N.Y. 2013). There, the plaintiffs brought "continuing nuisance" claims against contractors that built sewers, pursuant to public works contracts. Relying on *Newburgh*, the Court found that since "the gravamen of the complaints is that defendants, through their alleged faulty construction, breached their duty to plaintiffs under the protection clauses in the public works contracts," the claims arose from the contractual relationship between the parties. *Oyster Bay*, 4 N.E.3d at 948. Thus, the Court concluded that the claims were barred by the six year statute of limitations for breach of contract, N.Y. C.P.L.R. § 213(2), which started to run on the date construction was completed. Further, the Court noted that even if the plaintiffs' claims "could be considered independent causes of action that do not arise from the contracts—thus avoiding dismissal under *Newburgh*—the actions were still properly dismissed as time-barred" because "[a]n action to recover damages for injury to property must be commenced *within three years of the date of the injury*." *Id.* at 949 (emphasis added) (citing N.Y. C.P.L.R. § 214(4)).[8]

Thus, the statute of limitations for a negligent construction claim depends upon the nature of the relationship between the parties. As Plaintiff points out, "the critical distinction for

---

[8] In a concurring opinion, two justices opined that the claims did not arise out of a contractual relationship between the parties, and therefore, "the governing accrual rule is the usual one in tort cases: the cause of action accrued when injury was inflicted." *Oyster Bay*, 4 N.E.3d at 950. The concurrence found that the injury occurred "when defendants' alleged negligence caused plaintiffs' roadways to be without sufficient support," even if the plaintiffs did not know of the injury at the time. *Id.* at 951.

purposes of which statute of limitations applies and when it accrues is whether the injured

property owner has a contractual relationship with the defendant contractor." (Dkt. No. 66, p.

13). If the claim arises from a contractual relationship, then the six year breach of contract

statute of limitations starts on the date construction was completed. If the claim does not arise

from a contractual relationship, however, then the three year statute of limitations for negligence

starts on the date of injury.[9] This approach accords with the long-standing rule that "in applying

the statute of limitations we look for the reality, and the essence of the action and not its mere

name." *Victorson v. Bock Laundry Mach. Co.*, 335 N.E.2d 275, 278 (N.Y. 1975) (quoting *Brick

v. Cohn-Hall-Marx Co.*, 11 N.E.2d 902, 904 (N.Y. 1937)).

   As an another illustrative example, in *Gordon v. Bd. of Managers of 18 E. 12th St.

Condo.*, the owner of a condominium brought a negligent construction claim against a building

contractor, after a concrete slab collapsed during renovations and caused property damage. 950

N.Y.S.2d 723 (N.Y. Sup. Ct. 2012), *aff'd*, 958 N.Y.S.2d 360 (N.Y. App. Div. 1st Dept. 2013).

The plaintiff purchased the condo in 2007, almost twenty years after the defendant completed

construction in 1986. *Id.* The defendant argued that the plaintiff's claim accrued on the date of

completion and therefore was barred by the statute of limitations. *Id.* at *5. However, the court

concluded the plaintiff's claim was timely; since there was no contractual relationship between

the parties, "[a]ny purported liability would not have its genesis in any contractual relationship,

---

[9] Consistent with this distinction, the majority of cases relied upon by Defendant for applying the date of completion
involved contractual relationships. *See, e.g., Heritage Hills Soc., Ltd. v. Heritage Dev. Group, Inc.*, 867 N.Y.S.2d
149 (N.Y. App. Div. 2d Dept. 2008) (discussing parallel breach of contract and negligence claims). Although
Defendant cites one case which stated that the date of completion would apply to a negligent construction claim
even without a contractual relationship between the parties, the court assumed that a contractual relationship existed,
and further, did not recognize the rationale for the injury/completion distinction between claims sounding in tort
versus contract. *See Phoenix Ins. Co. v. APF Fire Protec., Inc.*, 08 Civ. 7935, 2011 WL 2848183, at *3-4, 2011
U.S. Dist. LEXIS 80320, at *12-13 (S.D.N.Y. Apr. 7, 2011), *report and recommendation adopted*, No. 08 Civ.
7935, 2011 WL 2802930, 2011 U.S. Dist. LEXIS 79551 (S.D.N.Y. July 14, 2011).

rather, it would have its basis in the defective construction, which was only realized at the time of the injury." *Id.* at * 8.  On appeal, the Appellate Division agreed, observing that "[t]he claim accrued on the date of the injury, not on the date of completion of the construction because it is a tort claim." *Gordon v. Bd. of Managers of 18 E. 12th St. Condo.*, 958 N.Y.S.2d 360, 362 (N.Y. App. Div. 1st Dept. 2013).

In this case, Plaintiff's negligent construction claim is timely because it sounds in tort and does not arise from any contractual relationship with Defendant.  There is no allegation or evidence that Plaintiff's insureds, the Sciarrinos, had any involvement whatsoever in the contract with Defendant for the installation of the fireplace.  Rather, Defendant was retained by Ryan Homes as a subcontractor to install fireplaces for all the homes in the Sorrell Hill development. (Dkt. No. 58-10, ¶¶ 8, 21).  The contract governing this job has not been submitted as evidence. Defendant completed the relevant installation in August 2009, the Sciarrinos then purchased the home and moved in the next month, and the fire occurred on January 1, 2014.  (*Id.*, ¶¶ 1, 14). Based on the undisputed facts, it cannot be said that any liability for negligent construction "has its genesis in the contractual relationship of the parties."  *Newburgh*, 650 N.E.2d at 401.  Thus, the essence of Plaintiff's claim is ordinary negligence, not breach of contract.  Accordingly, Plaintiff's claim accrued and became enforceable on the date of injury, rather than the date Defendant completed construction of the fireplace.  In this case, the Court finds that the date of injury was January 1, 2014, when the fire occurred and the alleged tort caused property damage to the Sciarrino home.[10]  *See IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 907 N.E.2d 268,

---

[10] "In order to establish a prima facie case of negligence under New York law, a claimant must show that: (1) the defendant owed the plaintiff a cognizable duty of care; (2) the defendant breached that duty; and (3) the plaintiff suffered damage as a proximate result of that breach." *Stagl v. Delta Airlines, Inc.*, 52 F.3d 463, 467 (2d Cir. 1995).

273 (N.Y. 2009) ("A tort claim accrues as soon as the claim becomes enforceable, i.e., when all elements of the tort can be truthfully alleged in a complaint. As with other torts in which damage is an essential element, the claim is not enforceable until damages are sustained.") (internal quotations and citation omitted); *Schmidt v. Merchants Despatch Transp. Co.*, 200 N.E. 824, 827 (N.Y. 1936) ("The injury occurs when there is a wrongful invasion of personal or property rights and then the cause of action accrues. . . . [T]he statutory period of limitations begins to run from the time when liability for wrong has arisen even though the injured party may be ignorant of the existence of the wrong or injury."); 16 N.Y. Prac., New York Law of Torts § 19:32 ("The general rule in property injury cases is that the cause of action accrues upon the invasion of the property right, that is, upon the injury, regardless of how slight the injury is and regardless of plaintiff's knowledge or lack of knowledge of the injury.").

In sum, starting on January 1, 2014 and applying the three year statute of limitations for a negligence claim to recover damages for an injury to property, N.Y. C.P.L.R. § 214(4), the Complaint filed on March 18, 2015 is timely.[11]  *See also All Craft Fabricators, Inc. v. Syska Hennessy Group, Inc.*, 39 N.Y.S.3d 783 (N.Y. App. Div. 1st Dept. 2016) ("Because the parties have no contractual relationship with each other, the claim must be viewed in terms of simple negligence, with accrual occurring within three years of the date of injury, rather than a claim for professional negligence, which generally accrues upon the completion of the work at issue.") (internal citations omitted); *Travelers Prop. Cas. Co. of Am. v. Sanco Machanical, Inc.*, 5

---

[11] Plaintiff indicates, without citing any evidence, that "[t]he Sciarrinos purchased the Property new from Ryan Homes and selected the option of a wood burning fireplace." (Dkt. No. 66, p. 15). However, even if the Sciarrinos were somehow in privity of contract with Defendant as third party beneficiaries to the installation contract, *see Newburgh*, 650 N.E.2d at 400, Plaintiff's claim would be timely since it commenced this action within six years after construction was completed in August 2009.

N.Y.S.3d 88, 89 (N.Y. App. Div. 1st Dept. 2015) ("The action, involving a flood at [a] retail

store, is not time-barred, as it was commenced within three years of the date of the accident.");

*Barrell v. Glen Oaks Village Owners, Inc.*, 814 N.Y.S.2d 276, 277 (N.Y. App. Div. 2d Dept.

2006) ("the plaintiffs' claim [for personal injuries] against the defendant plumbing company for

negligent installation of the washing machine and attendant plumbing accrued on the date the

injury was sustained, and not on the date the work was performed"); *Tupaz v. City of New York*,

814 N.Y.S.2d 565 (N.Y. Civ. Ct. 2005) ("since plaintiff's cause of action against the City sounds

in negligence, his cause of action accrued when the damages occurred"); *IFD Const. Corp. v.

Corddry Carpenter Dietz and Zack*, 685 N.Y.S.2d 670, 672 (N.Y. App. Div. 1st Dept. 1999) ("in

the context of a personal injury action against a design professional by a party who did not retain

the design professional, the cause of action accrues on the date of injury"); *Com. & Indus. Ins.

Co. v. Vulcraft, Inc.*, No. 97 Civ. 2578, 1998 WL 823055, at *6, 1998 U.S. Dist. LEXIS 18393,

at *15 (S.D.N.Y. Nov. 20, 1998) (finding that the "plaintiff's non-contract claims against

[including negligent construction] arose at the time of injury—that is, when the roof collapsed in

1996—and they are therefore timely").

### B.    Strict Product Liability

#### 1.    Sufficiency of Plaintiff's Allegations

As a first step, the Court will address Defendant's argument that the Second Amended

Complaint fails to state a claim for strict product liability.  *See Siani v. State U. of New York at

Farmingdale*, 7 F. Supp. 3d 304, 315 (E.D.N.Y. 2014) ("it is worthwhile at the outset to apply

the standard of Rule 12(b)(6) to the six causes of action naming all defendants, before engaging

in more fact-intensive summary judgment review below").  In the Second Amended Complaint,

18

Plaintiff alleges that Defendant was in the business of regularly selling fireplaces, that Defendant supplied a fireplace in defective condition, "and the defect in the [f]ireplace was a substantial factor in causing the fire and resulting damages."  (Dkt. No. 45, ¶¶ 17-18).  Defendant argues that Plaintiff fails to state a claim for strict product liability, under either design defect or manufacturing defect theories, because it "provides no allegations setting forth any design theory or any alleged facts pertaining to what the alleged defect is."  (Dkt. No. 58-1, p. 14).

In response to Defendant's motion, Plaintiff appears to concede that the allegations are technically insufficient, but seeks leave to amend (Dkt. No. 66, pp. 26-28), and has filed a proposed Third Amended Complaint.  (Dkt. No. 66-1, pp. 194-98).  In general, leave to amend should be freely given "when justice so requires."  Fed. R. Civ. P. 15(a)(2).  On the other hand, where, as here, a scheduling order has been entered and the time to amend has expired, "the lenient standard under Rule 15(a) . . . must be balanced against the requirement under Rule 16(b) that the Court's scheduling order 'shall not be modified except upon a showing of good cause.'"  *Grochowski v. Phoenix Const.*, 318 F.3d 80, 86 (2d Cir. 2003).  "[I]n allowing modifications of scheduling orders only for good cause, [Rule 16(b)] provides the district courts discretion to ensure that limits on time to amend pleadings do not result in prejudice or hardship to either side."  *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 243-44 (2d Cir. 2007).

Moreover, "where plaintiff seeks to amend its complaint while a motion to dismiss is pending, "a court has a variety of ways in which it may deal with the pending motion to dismiss, from denying the motion as moot to considering the merits of the motion in light of the amended complaint."  *Haag v. MVP Health Care*, 866 F. Supp. 2d 137, 140 (N.D.N.Y. 2012) (internal quotation and citation omitted).  Since Defendant has had an opportunity to respond to the

proposed amendments and was on notice of Plaintiff's design defect theory of liability by virtue

of the briefing associated with Plaintiff's previous motion for leave to file a Second Amended

Complaint (*see* Dkt. No. 39), the merits of the motion to dismiss will be considered in light of

the proposed Third Amended Complaint.  If the proposed Third Amended Complaint cannot

survive the motion to dismiss, then Plaintiff's request for leave to amend will be denied as futile.

*See Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir. 2002)

("An amendment to a pleading will be futile if a proposed claim could not withstand a motion to

dismiss pursuant to Rule 12(b)(6).").

　　　　Under New York law, to state a cause of action for a design defect, the plaintiff "must

allege that the [product] was unreasonably dangerous for its intended use."  *McCarthy v. Olin*

*Corp.*, 119 F.3d 148, 155 (2d Cir. 1997).  Ultimately, to prevail on a design defect claim,

Plaintiff must show: "(1) the product, as designed, posed a substantial likelihood of harm; (2) it

was feasible to design the product in a safer manner; and (3) the defective design was a

substantial factor in causing plaintiff's injury."  *Maxwell v. Howmedica Osteonics Corp.*, 713 F.

Supp. 2d 84, 90 (N.D.N.Y. 2010).

　　　　In the proposed Third Amended Complaint, Plaintiff adds the following allegations to its

strict product liability claim:

> The Fireplace was defective in its design because the control access cover for the
> blower compartment was not properly secured to the Fireplace.
>
> The manufacturer of the product knew that the control access cover could shift
> during transport but did nothing to secure it in place.
>
> Securing the control access cover plate in place could have been done by using
> any number of readily available and commonly applied fastening materials.
>
> Adding the fastening materials would have added minimal cost to Fireplace and

would not have in any way impacted the utility of the Fireplace.

As a result of the aforesaid design defect, the control access cover slid out of place at some point prior to the eventual installation of the Fireplace at the Property.

This design defect left an opening between the fire box and the blower compartment, which permitted an ember from the operating Fireplace to fall from the fire box into the blower compartment and eventually come into contact with the combustible subfloor under the Fireplace, which resulted in the Fire.

The defective design of the Fireplace was a substantial factor in causing the Fire.

(Dkt. No. 66-1, p. 197). Accepting these new allegations as true and drawing all reasonable inferences in Plaintiff's favor, the Court finds that allowing Plaintiff to amend would not be futile because Plaintiff has stated a claim for strict product liability under a design defect theory. Therefore, Defendant's motion to dismiss Plaintiff's claim is denied, and Plaintiff is granted leave to file the proposed Third Amended Complaint.

## 2.    Summary Judgment

For purposes of summary judgment, Defendant further argues that Plaintiff's strict product liability claim must fail because Defendant "was a subcontractor providing services on a construction project, and was not a seller/distributor of fireplaces in connection with this incident." (Dkt. No. 58-1, p. 10). Defendant contends that "strict product liability does not apply to a hybrid sales-service transaction if the transaction is predominantly a service contract." (*Id.*). Defendant relies on "the principle that strict liability actions cannot be maintained where the transaction is predominately a service contract despite the existence of elements of a sale." *Stafford v. Intl. Harvester Co.*, 668 F.2d 142, 146 (2d Cir. 1981) (citing *Perlmutter v. Beth David*

*Hosp.*, 123 N.E.2d 792, 794 (N.Y. 1954)).[12]  Put another way, New York law will not sustain a claim founded in strict liability "if the transaction was predominately a service contract with only an incidental transfer of goods."  *Id.*  This limitation is based on the idea of effectuating the intentions and expectations of the contracting parties—that "unless the parties have contractually bound themselves to a higher standard of performance, reasonable care and competence owed generally by practitioners in the particular trade or profession defines the limits of an injured party's justifiable demands."  *Milau Associates v. N. Ave. Dev. Corp.*, 368 N.E.2d 1247, 1250 (N.Y. 1977).  Thus, where the contract is predominantly for a service, claims will only lie in negligence for deficient performance of the service, or in contract if there is a breach.  *Id.* (citing *Aegis Productions, Inc. v. Arriflex Corp. of Am.*, 268 N.Y.S.2d 185, 187 (N.Y. App. Div. 1st Dept. 1966)).

Setting aside the nature of any contract, Plaintiff argues that Defendant is subject to strict product liability for any damages caused by defects in the fireplace because the evidence shows that it is "regular seller" of fireplaces under New York law.  (Dkt. No. 66, pp. 16-24).  "For strict liability purposes, New York courts have drawn a distinction between 'regular' sellers, who sell a given product in the ordinary course of their business, and 'casual' or 'occasional' sellers, whose sale of a product is wholly incidental to the seller's regular business."  *Jaramillo v. Weyerhaeuser Co.*, 570 F.3d 487, 489 (2d Cir. 2009).  Only regular sellers of products are subject to strict liability, based on two policy reasons: 1) "their continuing relationships with manufacturers" often enable such sellers "to exert pressure for the improved safety of products and [to] recover increased costs within their commercial dealings, or through contribution or

---

[12] *Stafford* has since been abrogated on other grounds.  *See Ins. Co. of N.A. v. ABB Power Generation, Inc.*, 690 N.E.2d 1249, 1251 (N.Y. 1997) ("We conclude that *Stafford* misconstrues CPLR 202.")

indemnification in litigation"; and 2) "by marketing the products as a regular part of their business such sellers may be said to have assumed a special responsibility to the public, which has come to expect them to stand behind their goods." *Id.* (quoting *Sukljian v. Charles Ross & Son Co., Inc.*, 503 N.E.2d 1358, 1360 (N.Y. 1986)).

Defendant argues that Plaintiff's reliance on the "regular seller" rule is misplaced, because the "relevant inquiry is whether MIG/IBP's role with respect to the fireplace was predominantly sales." (Dkt. No. 78, p. 8). The parties have not cited to any cases discussing the interaction of the sales-service dichotomy and the regular seller rule.[13] In any event, as set forth below, there are material issues of fact regarding both issues.

### a.    Regular Seller Requirement

Plaintiff argues that Defendant is a regular seller of fireplaces "because a major component of its business is supplying fireplaces." (Dkt. No. 66, p. 16). As evidence, Plaintiff points to the undisputed facts that: 1) Defendant sold fireplaces to builders and homeowners; 2) Defendant installed at least three to five fireplaces a day in 2009; 3) at the time every fireplace that Defendant installed was also sold by Defendant; and 4) Defendant has several locations in upstate New York with showrooms to display fireplaces and warehouses to store fireplaces. (Dkt. No. 66-2, ¶¶ 7-11). Defendant's Regional Vice President of Installed Building Products, Marc Williamson, states in his affidavit that, "as of 2009, MIG was providing its services to approximately 75% of all of the builders in the Rochester/Syracuse area." (Dkt. No. 58-2, ¶ 14). Williamson also states that "[a]ny transfer of personal property (the insulation or fireplaces) on

---

[13] The Court notes that the Restatement of Torts recognizes the sales-service dichotomy, and may provide guidance. *See* Restatement (Third) of Torts: Prod. Liab. § 20(c) (1998) (including certain transactions involving a "combination of products and services" as sales or distributions which would be subject to strict product liability).

these projects was incidental to the installation services that MIG was providing to these builders at that time." (*Id.*, ¶ 18).  Despite Williamson's characterization of the focus of Defendant's business on installation, there is no dispute that Defendant also sold a large volume of fireplaces in 2009, at least hundreds of units.  However, it is not clear how many of these units were the same model and from the same manufacturer as the fireplace at issue in this case, a "DESA wood-burning fireplace," as opposed to other fireplaces.[14]  Absent this information, the Court cannot determine as a matter of law that Defendant was a regular seller of the allegedly defective product, so as to kindle the special policy considerations that support strict product liability.  *Cf. Santoro ex rel. Santoro v. Majestic Fireplace Corp.*, No. 02 Civ. 8796, 2004 WL 2569493, at *5, 2004 U.S. Dist. LEXIS 22849, at *23,  (S.D.N.Y. Nov. 12, 2004) (finding that the defendant "sold fireplace heaters as a regular part of its business" based on evidence including that the defendant "sold approximately fifty units of model number 43 BDTVRP, the same fireplace heater" the plaintiff was injured by); *see also Bailey v. Disney Worldwide Shared Services*, 950 N.Y.S.2d 607 (N.Y. Sup. Ct. 2012) ("whether Disney was a casual seller or one engaged in a regular part of its business when it sold Buena Vista the bridge is a question best left for the factfinder").

### b.       Sales-Service Requirement

It is undisputed that Defendant sold a fireplace installation package to Ryan Homes which included the cost and labor for the fireplace unit at issue and its installation.  (Dkt. No. 66-2, ¶ 2).  Although Defendant has adduced evidence that the installation (the "service" aspect)

---

[14] In its responses to Plaintiff's Requests for Admission, Defendant denied that it regularly sold DESA model fireplaces or was an authorized distributor of DESA fireplaces.  (Dkt. No. 66-1, pp. 37, 46).  Further, it is not clear from the deposition of Defendant's employee, Sailor, how often he installed the DESA wood-burning fireplace at issue in this case.  (Dkt. No. 66-1, pp. 20-21).

was laborious and time-intensive (*see* Dkt. No. 58-10, ¶¶ 23-33), and Plaintiff has adduced

evidence that the fireplace itself (the "sales" aspect) was the biggest cost in the transaction (*see*

Dkt. No. 66-2, ¶¶ 3-4), the parties have not submitted as evidence any contract specifically

covering the sale and installation of the fireplace.  Without examining the contract, the Court can

hardly divine the "essence" of the agreement.  *Perlmutter*, 123 N.E.2d at 794.  Accordingly,

there is a genuine issue of fact as to which aspect of the contract predominated.  *See In re Compl.*

*of Rationis Enterprises, Inc. of Panama*, No. 97 Civ. 9052, 2003 WL 203210, at *2, 2003 U.S.

Dist. LEXIS 1348, at *8 (S.D.N.Y. Jan. 29, 2003) ("there is an issue of fact as to whether the

work performed by Hyundai was merely repairs or if it is more properly categorized as a hybrid

service-sale transaction and if so, whether the service or the sale part predominates") *decision*

*disapproved in part sub nom. Rationis Enterprises Inc. of Panama v. Hyundai Mipo Dockyard*

*Co., Ltd.*, 426 F.3d 580 (2d Cir. 2005); *Robert Plan Corp. v. Perot Sys. Corp.*, 718 N.Y.S.2d 50,

51 (N.Y. App. Div. 1st Dept. 2000) ("Dismissal of the contract causes of action as time-barred

was properly denied on the ground that an issue of fact exists as to whether the contract in issue .

. . was predominantly one for the sale of goods or indivisible services.").

 In sum, based on the aforementioned issues of fact, neither side is entitled to summary

judgment on Plaintiff's strict product liability claim.

 **C.** **Expert Testimony**

 Plaintiff argues that the Court should preclude Defendant's expert, Aaron Butcher, from

offering opinions on the cause of the fire under *Daubert* "because his methodology is incomplete

and unreliable."  (Dkt. No. 66, pp. 28-36).  Plaintiff further contends that, if the Court precludes

Butcher's testimony and finds that Defendant is a regular seller as a matter of law, the Court

should grant summary judgment in Plaintiff's favor on the strict liability claim.  (*Id.*, pp. 38-39).
Defendant counters that Plaintiff's cross-motion for summary judgment must fail because
"causation of the fire is a material issue in dispute regardless of Aaron Butcher's opinion."  (Dkt.
No. 78, p. 21).  Defendant also argues that Plaintiff's motion to preclude Butcher's opinion must
be denied because "Plaintiff's criticisms regarding the degree of compliance with the NFPA, and
what further testing Mr. Butcher should have done, go to the *weight* of the expert's opinion, not
admissibility."  (*Id.*, p. 26).

As an initial matter, Plaintiff is not entitled to summary judgment on its strict product
liability claim, since there is an issue of fact as to whether Defendant is a regular seller of the
allegedly defective fireplace, and further, there is an issue of fact as to whether "the defective
design was a substantial factor in causing plaintiff's injury."  *Maxwell*, 713 F. Supp. 2d at 90.
Plaintiff must show causation to prevail on its claim, and even disregarding Butcher's testimony,
there is evidence supporting several theories of causation, including negligent installation of the
fireplace and/or blower and design defect in the fireplace's control access panel.  *See* Part II(C).
This conflicting evidence creates an issue of fact as to causation which must be resolved at trial,
"subject to the refining fire of cross-examination."  *Hodosh v. Block Drug Co., Inc.*, 786 F.2d
1136, 1143 (Fed. Cir. 1986); *see also Monell v. Scooter Store, Ltd.*, 895 F. Supp. 2d 398, 412
(N.D.N.Y. 2012) (noting that "conflicting expert testimony . . . creates questions of fact and
credibility determinations to be answered by the jury"); *Speller ex rel. Miller v. Sears, Roebuck
and Co.*, 790 N.E.2d 252 (N.Y. 2003) ("Where causation is disputed, summary judgment is not
appropriate unless only one conclusion may be drawn from the established facts") (internal
quotation and citation omitted).

Finally, the Court declines to preclude Butcher's testimony entirely.  Under Rule 702 of the Federal Rules of Evidence, the Court is charged with a "gatekeeping" obligation with respect to expert testimony: the trial judge must ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  "Under *Daubert*, factors relevant to determining reliability include the theory's testability, the extent to which it has been subjected to peer review and publication, the extent to which a technique is subject to standards controlling the technique's operation, the known or potential rate of error, and the degree of acceptance with the relevant scientific community."  *Restivo v. Hessemann*, No. 14-4662-CV, 2017 WL 218006, at *18, 2017 U.S. App. LEXIS 948, at *64 (2d Cir. Jan. 19, 2017) (internal quotations and citation omitted).  The reliability inquiry is "a flexible one," *Daubert*, 509 U.S. at 594, and the factors to be considered "depend[ ] upon the particular circumstances of the particular case at issue."  *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999).  When applying the gatekeeping obligation to non-scientific testimony, such as testimony from engineers, a district court may choose to utilize some or all of the above *Daubert* factors, or it may look to other indicia of reliability.  *Id.* Ultimately, a district court has "the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination."  *Id.* at 142.

Plaintiff argues that Butcher's testimony should be precluded because he failed to follow the scientific method under the National Fire Protection Association Guide for Fire and Explosion Investigations ("NFPA 921") and thus his opinion that the cause of the fire is undetermined is not based on a reliable methodology. (Dkt. No. 66, pp. 28-38). NFPA 921 provides a seven step scientific method to be followed in fire related investigations: 1) recognize the need (identify the problem); 2) define the problem; 3) collect data; 4) analyze the data; 5) develop a hypothesis; 6) test the hypothesis; and 7) select the final hypothesis. (Dkt. No. 66-1, pp. 190-91). Plaintiff argues that Butcher's methodology is unreliable because, after developing four hypotheses for the cause of the fire, he did not complete the last two steps by testing them and selecting one. (Dkt. No. 66, pp. 30, 36; *see also* Dkt. No. 66-1, pp. 183-86). Therefore, Plaintiff contends, Butcher cannot reliably opine that the cause of the fire is undetermined. (Dkt. No. 66, pp. 37-38).

Butcher testified that he relied on NFPA 921 in formulating his opinion (Dkt. No. 66-1, p. 153), and there is no dispute that he followed the first five steps of the methodology in identifying potential causes of the fire. While Butcher "did not eliminate every cause for the fire, this will not be determinative as to whether he will testify; all that it suggests is that the credibility of his decision may be subject to an attack." *Allstate Ins. Co. v. Gonyo*, No. 07 Civ. 1011, 2009 WL 1212481, at *6, 2009 U.S. Dist. LEXIS 36597, at *20 (N.D.N.Y. Apr. 30, 2009). In other words, although Butcher lacks a reliable foundation for his opinion that the cause of the fire was undetermined, he may nonetheless testify about the potential causes of the fire, and it will be up to Plaintiff to challenge Butcher's testimony through cross-examination. *See id.* ("Although Hanslmaier may not have ardently and strictly followed each step of NFPA, these

28

shortcomings will not be fatal to him testifying before the jury and having his opinion tested.");

*Argonaut Ins. Co. v. Samsung Heavy Industries Co. Ltd.*, 929 F. Supp. 2d 159, 167 (N.D.N.Y.

2013) (same); *Schlesinger v. U.S.*, 898 F. Supp. 2d 489, 505 (E.D.N.Y. 2012) ("The decision not

to follow the methodology set forth in NFPA 921, as well as other purported flaws in the Russo

methodology—*e.g.,* the failure to rule out other possible causes—goes to the weight of the

evidence, not its admissibility."); *see also Daubert*, 509 U.S. at 596 ("Vigorous cross-

examination, presentation of contrary evidence and careful instruction on the burden of proof are

the traditional and appropriate means of attacking shaky but admissible evidence." ).

## V.    CONCLUSION

For these reasons, it is

**ORDERED** that Defendant's motion for summary judgment and for 12(b)(6) dismissal

of Plaintiff's strict product liability claim (Dkt. No. 58) is **DENIED**; and it is further

**ORDERED** that Plaintiff's cross-motion for summary judgment, to preclude Defendant's

expert, and for leave to amend (Dkt. No. 66) is **GRANTED in part and DENIED in part**; and

it is further

**ORDERED** that Plaintiff's request for leave to amend is **GRANTED**; and it is further

**ORDERED** that Plaintiff shall file the proposed Third Amended Complaint as the

operative pleading in this case, **with allegations to properly support diversity jurisdiction** (*see*

Dkt. No. 84); and it is further

**ORDERED** that Plaintiff's motion (Dkt. No. 66) is otherwise **DENIED**.

**IT IS SO ORDERED.**

Date:  May 19, 2017
       Syracuse, New York

Brenda K. Sannes
U.S. District Judge

29